Raymond J. DONOVAN, Secretary of the
United States Department of Labor,
Plaintiff-Appellee,

v.

John C. BIERWIRTH, Robert G. Freese
and Carl A. Paladino,
Defendants-Appellants.

and

Joseph W. Ullman, Lillian E. Baldissard,
Rita V. Hafner, Anthony Pancella, Jr.,
Kathleen T. Chew and Benjamin L.
Crews, Intervenors-Appellants.

No. 880, Docket 82–6004.

United States Court of Appeals,
Second Circuit.

Argued March 19, 1982.

Decided May 10, 1982.

Robert N. Eccles, Atty., U. S. Dept. of Labor, Washington, D. C. (T. Timothy Ryan, Jr., Sol. of Labor, Monica Gallagher, Associate Sol., and Norman P. Goldberg, Sherwin S. Kaplan and Jane M. Kheel, Attys., U. S. Dept. of Labor, Washington, D. C., of counsel), for plaintiff-appellee.

Raymond L. Falls, Jr., New York City (Cahill, Gordon & Reindel, David R. Hyde and P. Kevin Castel, New York City, of counsel), for defendants-appellants.

Before FRIENDLY and PIERCE, Circuit Judges, and METZNER,* District Judge.

* Honorable Charles M. Metzner of the United States District Court for the Southern District of New York, sitting by designation.

FRIENDLY, Circuit Judge:

### I. The Nature of the Action and the Proceedings in the District Court

This action was brought on October 19, 1981, by the Secretary of Labor (the Secretary) under § 502(e)(1) of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1132(e)(1), in the District Court for the Eastern District of New York, against John C. Bierwirth, Robert G. Freese and Carl A. Paladino, Trustees of the Grumman Corporation Pension Plan (the Plan). The action stems from the unsuccessful tender offer by LTV Corporation (LTV) in the fall of 1981 for some 70% of the outstanding common stock and convertible securities of Grumman Corporation (Grumman) at $45 per share. At the time of the offer the Plan owned some 525,000 shares of Grumman common stock, which it had acquired in the mid-1970's. As hereafter recounted, the Plan not only declined to tender its stock but purchased an additional 1,158,000 shares at an average price of $38.27 per share, at a total cost of $44,312,380. These acts, the Secretary's complaint alleged, constituted a violation of §§ 404(a) and 406(b) of ERISA, 29 U.S.C. §§ 1104(a) and 1106(b) which we set out in the margin.[1]

Simultaneously with filing the complaint, the Secretary moved for a temporary re-

---

1. § 1104. Fiduciary duties

(a) Prudent man standard of care

(1) Subject to sections 1103(c) and (d), 1342, and 1344 of this title, a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

(A) for the exclusive purpose of:

(i) providing benefits to participants and their beneficiaries; and

(ii) defraying reasonable expenses of administering the plan;

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

(C) by diversifying the investments of the plan so as to minimize the risk of large loss-es, unless under the circumstances it is clearly prudent not to do so; and

(D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter.

(2) In the case of an eligible individual account plan (as defined in section 1107(d)(3) of this title), the diversification requirement of paragraph (1)(C) and the prudence requirement (only to the extent that it requires diversification) of paragraph (1)(B) is not violated by acquisition or holding of qualifying employer real property or qualifying employer securities (as defined in section 1107(d)(4) and (5) of this title).

§ 1106. Prohibited transactions

(b) A fiduciary with respect to a plan shall not

(1) deal with the assets of the plan in his own interest or for his own account,

(2) in his individual or in any other capacity act in any transaction involving the plan on

straining order and preliminary injunction, to prohibit the Trustees of the Plan from buying, selling or exercising any rights with respect to Grumman securities and to appoint a receiver for the securities already held by the Plan. On October 19 the motion for a temporary restraining order came on for hearing before Judge Mishler, who had already, on October 14, 1981, issued an order temporarily enjoining the tender offer because of inadequate disclosure and threatened violation of § 7 of the Clayton Act, *Grumman Corp. v. LTV Corp.*, 527 F.Supp. 86, which this court was later to affirm on November 13, 1981, 665 F.2d 10. Counsel appearing for the trustees agreed to maintain the *status quo* until the motion for a preliminary injunction and the appointment of a receiver could be brought on for hearing on October 30, 1981; on that basis the motion for a temporary restraining order was withdrawn. No testimony was taken at the October 30 hearing; the matter was submitted on affidavits, depositions, public filings and a stipulation of background facts. A number of participants in the Plan were allowed to intervene as defendants; a supporting affidavit of one of the Plan participants alleged that:

> [S]pontaneously and within days after this suit was commenced, Grumman employees at all levels and in all departments began to circulate petitions expressing their approval of the trustees' actions, as participants in the Pension Plan. To date, petitions have been signed by approximately 17,000 of the 22,000 employees who are Plan participants and beneficiaries.

On December 3, 1981, the district court, 538 F.Supp. 463, rendered an opinion containing its findings of fact and conclusions of law. Joint App. 193a. After rejecting the Secretary's contention that the trustees committed *per se* violations of ERISA and making a detailed survey of the evidence, the judge concluded that the Secretary had "shown a likelihood of success on his claim

that each of the trustees has acted imprudently with respect to their recent investment decisions concerning Grumman stock". He invited suggestions with respect to the form of preliminary relief. The trustees proposed that if the court felt it necessary to go beyond a preliminary injunction with respect to dealings in Grumman securities, it should adopt a proposal of the Grumman board, embodied in a resolution passed on December 17, 1981, that the board, with all management directors abstaining, should appoint three non-management directors as interim trustees. Declining this proposal the judge entered an order which preliminarily enjoined the trustees from buying, selling or exercising any rights with respect to Grumman securities except upon further order of the court and directed the appointment of a receiver to serve as an "Investment Manager" for Grumman securities owned by the Plan, with "power to sell, tender for sale, or otherwise dispose of all or part of such stock or securities." The order contained elaborate provisions concerning the qualifications, method of appointment and compensation of the Investment Manager. The provisions with respect to the Investment Manager were stayed on condition "that defendant promptly request and diligently pursue an expedited appeal" to this court, which was done.

## II. The Facts

The LTV tender offer followed a scenario that has become familiar. On September 21, 1981, in the absence of defendant Bierwirth, Chairman of the Board of Grumman, who was on vacation, Joseph O. Gavin, Jr., President of Grumman, received a telephone call from Paul Thayer, Chairman of the Board and Chief Executive Officer of LTV, inviting him to discuss a possible merger. Gavin rejected the invitation. Evidently unsurprised, LTV, prior to the opening of trading on the New York Stock Exchange on September 23, issued a press

---

behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or

(3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

release announcing that it was planning to make a cash tender offer at $45 per share for up to 70% of Grumman's common stock and securities representing or convertible into common stock. According to the press release, the offer constituted "the first step in a plan to acquire 100% of the voting equity of the Grumman Corporation". On September 21 and 22 Grumman stock had sold on the New York Stock Exchange at prices ranging between 23⅞ and 27¼. Later in the morning of September 23 Grumman put out a release on the Dow Jones News Service in Bierwirth's name stating that the Grumman directors would promptly consider the proposed offer. The release noted that the board would "consider legal factors including antitrust implications,"[2] warned stockholders not to act hastily and said that Dillon, Read & Co. had been retained to provide advice regarding the LTV offer. On the same day LTV delivered to Bierwirth's office a letter expressing regret at the lack of a meeting in which LTV would have had an "opportunity to spell out in a personal way how . . . combination would be beneficial to the shareholders, employees, and communities served by Grumman", and stating that "[t]he headquarters of a combined Grumman-Vought aerospace operation would be established in Bethpage, Long Island [Grumman's headquarters] under a top management team that would include you as CEO as well as Joe Gavin and George Skurla from Grumman and Bob Kirk from Vought." Thayer continued to hope for "the opportunity to explain to you in more detail the advantages of the synergistic combination" he had proposed and enclosed a copy of the press release.

The LTV offer was made on September 24. It was conditioned upon the tender of a minimum of 50.01% of Grumman's common stock and securities representing or convertible into common stock. The withdrawal/proration date was 12:01 A.M. on October 16, 1981; the termination date was 12:01 A.M. on October 23. Bierwirth cut short his vacation and reached the Grumman office at midday on September 24.

Although SEC Rule 14e–2, 17 C.F.R. § 240.14e–2, gave the Grumman board 10 business days from the commencement of the offer to communicate its position, if any, the board lost no time in going into action. It met on September 25. By then the LTV offer had caused the price of Grumman stock to rise to a range of 32⅝ to 34¼. The board had before it a two page letter of Dillon, Read & Co., Inc., which had served Grumman as investment banker, stating in a conclusory fashion that it was "of the opinion that the offer is inadequate from a financial point of view to holders of the Grumman securities." The letter said this conclusion was based on

certain information of a business and financial nature regarding Grumman which was either publicly available or furnished to us by Grumman and [on] discussions with the management of Grumman regarding its business and prospects.

The letter made no attempt at quantification of these factors, and no representative of Dillon, Read attended the meeting for questioning, although apparently there were some supporting financial materials available. Defendant Robert G. Freese had also prepared some projections which are not in the record. The board unanimously adopted a resolution to oppose the tender offer, and issued a press release to that effect, saying that the board had concluded that "the offer is inadequate, and not in the best interests of Grumman, its shareholders, employees or the United States."

On September 28 Grumman began the previously mentioned action which was to lead to the injunction of the tender offer. On the same day defendant Bierwirth, Chairman of the Board of Grumman, sent a letter to the company's shareholders seeking their help in defeating the offer. The letter stated:

We're very optimistic about our chances of defeating the takeover bid. About a third of all shares are held by

---

2. These arose from the fact that one of LTV's subsidiaries was Vought Corporation which, like Grumman, was a manufacturer of military aircraft and airframe subassemblies.

Grumman's employee investment and pension plans. These plans are managed by Grummanites who will look long and hard at how well their fellow members would be served by selling off Grumman stock. Much of the rest is owned by Grumman people who, I believe, understand their future is worth more than a quick return on a block of shares.

The reasons given for opposing LTV's offer were the inadequacy of the price and others, relating to the pension fund, set forth in the margin.[3] The letter concluded by announcing that "Grumman's management is totally committed to defeating this takeover attempt", and by pleading "If you own Grumman shares, don't sell out to LTV".

On September 30, at the invitation of George Petrilak, President of the Grumman Retirees Club, Bierwirth met with 300 retirees to discuss the LTV offer. An affidavit of Petrilak avers that "there was great concern expressed by the members as to the possible impact of LTV succeeding in their tender offer upon their pensions," and said that "[t]he overwhelming attitude of the retirees was 'what is good for Grumman is good for retirees' ". The Club purchased an advertisement appearing in Newsday, a Long Island newspaper, on October 13, headed

Grumman retirees protect your pension.

Do not tender your stock to LTV.

Expectably, Bierwirth spent about 90% of his time during the next fortnight in activity directed to opposing the LTV offer. Freese devoted at least half his time to arranging an "additional bank credit facility". This was done "without any specific plans as to the use of the proceeds" in order "to have as much borrowing capability as possible in the event the Board wanted to

take some action...." Two borrowings had been made as of the date Freese's deposition was taken. One was for "compensating balances that are required under the agreement itself"; the second was "to have the funds available to pay for ... up to a million shares of Grumman common stock."

The Grumman Pension Plan, established in 1943, is a "defined benefit plan" within the meaning of § 3(35) of ERISA, 29 U.S.C. § 1002(35),[4] meeting the requirements for qualification under § 401(a) of the Internal Revenue Code and covering both salaried and hourly employees. Initially banking institutions had acted as trustees of the Plan. However, in 1973 Grumman adopted a policy of having officers of Grumman or its affiliates serve as trustees, as permitted by § 408(c)(3) of ERISA, 29 U.S.C. § 1108(c)(3). The trustees in the fall of 1981 were Bierwirth; Freese, chief financial officer of Grumman since 1972; and Carl A. Paladino, Treasurer of Grumman Aerospace Corporation since 1969. John Mullan, associate general counsel of Grumman, has served as counsel to the trustees and regularly attended their meetings. Sometime prior to January 1, 1975, the Plan had acquired 525,000 Grumman shares.

On September 28 Freese mentioned to Bierwirth that the trustees "are going to have to get together here at some point and decide what [to] do in regard to the holdings of Grumman stock." Bierwirth agreed and said he would call Paladino. During the next ten days, the three trustees had casual conversations as they happened to meet each other. Nothing was said about the Plan's buying Grumman shares and no financial data were assembled for the meeting. Bierwirth had been informed by Mullan that if LTV succeeded, it could "merge the pension Plan though it may take them

---

**3.** There's one other factor to keep in mind: your pension fund. It's Grumman's policy to fully fund its employee pension fund. In contrast, LTV's pension fund right now is underfunded by almost a quarter of a billion dollars. Grumman people could lose if the two funds were to be merged.

**4.** Under a defined benefit plan, 29 U.S.C. § 1102(35), the sponsoring corporation fixes

the benefit levels for employee pensions and, based upon actuarial assumptions concerning investment return, mortality rates and so forth, contributes funds to the plan sufficient to pay these benefits. See Note, Fiduciary Standards and the Prudent Man Rule Under the Employment Retirement Income Security Act of 1974, 88 Harv.L.Rev. 960, 961–62 (1975).

some time" and also "could cancel the Plan to the extent that they eliminate the Fund although of course they would retain the corporate obligation to pay", and by unidentified other sources that changing the presumed earnings rate would permit the declaration of some of the fund as surplus and recapture for the corporation.

What occurred at the Plan trustees' meeting, which was held on October 7, was described in the depositions of the three trustees. Freese's is the most detailed; we shall follow it, with supplementation from the others when required. Mullan made a ten minute presentation dealing with ERISA, pointing out that the trustees' decisions "as far as the Grumman stock was concerned had to be predicated solely upon the best interests of the participants of the Plan". There was then a general discussion of how the trustees felt about LTV, the Dillon, Read opinion letter, and Freese's five year financial projections for Grumman. Elaborating on the discussion of LTV, Freese mentioned concern about the underfunding of "their pension plan", LTV's highly leveraged debt situation which would be aggravated by the need for borrowing to finance the acquisition of Grumman, contingent liability with respect to environmental problems and a large number of pending lawsuits and alleged SEC violations, all of which was revealed in a recent LTV prospectus.[5] The same information was contained in LTV's annual report and in its other publicly available filings. Freese expressed concern that the assumed rate of return used by LTV's pension plan was higher than that used by other companies and that LTV would have trouble making contributions to their pension plan. Bierwirth testified that the trustees "were aware of" a report about Grumman by Lehman Brothers Kuhn Loeb Inc. (Lehman Brothers). This report, dated July 8, 1981, which recommended purchase of Grumman common stock, then selling at $28 per share, projected a 1981–84 earnings progression of $2.75, $5.00, $6.50 and $7.50, and contained financial analysis supporting the estimates. The report's projection of greater sales was stated to be based primarily on "[i]ndications ... that [President] Reagan's request [for increased expenditures for military aircraft] will be approved by Congress" and Grumman's "promising diversification into aerospace subcontracting...."[6]

After a half hour's discussion the trustees voted not to tender the 525,000 Grumman shares held by the Plan. According to Bierwirth the trustees "then discussed whether we should take a second step. If we did not want to tender the stock at $45 a share, should we then consider buying additional shares, the market then being in the 30's?" A merit of such a purchase would be in making it more difficult for LTV to gain control of the pension fund. However, "it was also important that a further investment in Grumman shares be the right thing for us to do." "[A] number of fortuitous events had occurred during the summer and early in September which greatly enhanced the outlook for Grumman" and had made Bierwirth "feel earlier that a further investment in Grumman was desirable and should be recommended to the Trustees come this fall." While it had been "very difficult to accumulate substantial positions in Grumman stock", which ordinarily traded at volumes of 20,000 shares a day, the daily volume of half a million shares induced by the LTV offer made it "possible to accumulate a major position in Grumman stock without affecting the price all that much." Bierwirth was then of the view that "probably a majority of the stock would not be tendered" but could not feel confident

---

5. The prospectus, dated May 28, 1981 was in connection with a public offering of 4,000,000 shares of LTV of $24.50 per share. The syndicate managers were Lehman Brothers Kuhn Loeb Incorporated and Merrill Lynch White Weld Capital Markets Group. On September 24, 1981, the closing price of these shares was $14.75.

6. The district judge erred in referring to this report as having been "prepared with LTV's unique financial position and business objectives in mind." It was an investment recommendation prepared by Christopher C. Demish of Lehman Brothers' Research.

about it. He recognized that if the LTV tender offer were abandoned, selling by arbitrageurs would push the price down. Following their discussion of these ideas, the trustees concluded that purchases of Grumman stock up to the maximum of 10% of the value of the Plan's assets permitted by § 407(a)(2) of ERISA, 29 U.S.C. § 1107(a)(2), would be prudent.

Two steps were taken shortly after the meeting: Grumman applied to the SEC for an exemption from rule 10b–6, 17 C.F.R. § 240.10b–6, which was thought necessary to permit the Plan to purchase additional Grumman shares. Grumman and the trustees executed an amendment of the trust agreement adding a new paragraph which, among other things, provided that Grumman should indemnify and hold harmless each trustee from any liability or expense arising out of any act of failure to act pursuant to the trust unless the liability or expense resulted from willful misconduct or lack of good faith. Authorization of the planned purchases was deferred until the SEC had acted on Grumman's request for an exemption from SEC rule 10b–6. On October 8 a press release announced the decision of the trustees not to tender the Plan's shares.

The request to the SEC was granted on Friday, October 9. The trustees met briefly on Monday, October 12, and authorized the Plan's purchase of 1,275,000 additional Grumman shares—just short of ERISA's 10% limitation. A press release issued on October 13 stated that use of the authorization would increase the Plan's ownership of Grumman stock from 3.8% to approximately 8% of the outstanding fully diluted shares. The Plan, acting through Dillon, Read, purchased 958,000 shares at an average price of $38.61 per share on October 12 and an additional 200,000 shares on October 13 at an average price of $36.62, for a total cost of $44,312,380.

On the next day, October 14, as previously indicated, the district court temporarily enjoined the LTV offer, thereby drastically reducing its chances for success. The price of Grumman stock fell on October 15 to a range of 28¼–29½. After this court affirmed the temporary injunction, the price of Grumman shares was 28–28¾; the market value of the newly purchased shares was approximately $32,500,000. As this is written, the price is 26¼–26⅜.

### III. The Scope of Review

Despite oft repeated statements that the issuance of a preliminary injunction rests in the discretion of the trial judge whose decisions will be reversed only for "abuse", a court of appeals must reverse if the district court has proceeded on the basis of an erroneous view of the applicable law, *Ring v. Spina*, 148 F.2d 647, 650 (2 Cir. 1945); *Carroll v. American Federation of Musicians*, 295 F.2d 484, 488–89 (2 Cir. 1961); *Douglas v. Beneficial Finance Co.*, 469 F.2d 453, 454 (9 Cir. 1972), or of the standards governing the granting or denial of interlocutory relief, *Exxon Corp. v. New York*, 480 F.2d 460, 464 (2 Cir. 1973); *Dino DeLaurentiis Cinematografica, S.p.A. v. D–150, Inc.*, 366 F.2d 373 (2 Cir. 1966). A line of cases in this circuit, apparently having its source in *Dopp v. Franklin National Bank*, 461 F.2d 873, 878–79 (1972), has gone beyond this and held that, even when the district court has not thus erred, where that court did not hear live witnesses, whose credibility played an essential part in its determination, and the case was decided on the basis of pleadings, affidavits and depositions, which the court of appeals is in as good a position as the district judge to read and interpret, the appellate court is not limited to reversal for abuse of discretion. The description of how far the limit is transcended has varied—the appellate court has "broader discretion on review", *Dopp, supra*, 461 F.2d at 879; it is "able to exercise its discretion and to review the papers *de novo*", *San Filippo v. United Brotherhood of Carpenters & Joiners*, 525 F.2d 508, 511 (2 Cir. 1975); it "is not limited to reviewing the district court's exercise of discretion", *Forts v. Ward*, 566 F.2d 849, 852 n.8 (2 Cir. 1977); it may exercise "full review", *Jack Kahn Music Co. v. Baldwin Piano & Organ Co.*, 604 F.2d 755, 758 (2 Cir. 1979); *Crouse-Hinds Co. v. Internorth, Inc.*, 634 F.2d 690, 701 n.19 (2

Cir. 1980); and it "may consider the record de novo", at least when mandatory relief changing the *status quo* has been granted, *Doe v. New York University*, 666 F.2d 761, 765 (2 Cir. 1981). Two recent opinions have suggested that the use of the power to go beyond the "abuse of discretion" standard is itself discretionary, *New York v. Nuclear Regulatory Comm'n*, 550 F.2d 745, 750–53 (2 Cir. 1977); *Vidal Sasson, Inc. v. Bristol-Myers Co.*, 661 F.2d 272, 276 n.9 (2 Cir. 1981), with the former suggesting some guidelines as to how the discretion should be exercised. Factors favorable to the exercise of appellate discretion to engage in full review are that interlocutory relief has been granted rather than denied, lack of specificity in the findings of the trial court, and "defects, apart from the findings themselves, in the district court proceedings, which this court apparently believed justified a broader review of the lower court's proceedings . . . ." [7]

Whatever the end of this debate may be, we think this case is peculiarly one for applying a broad standard of review. The district judge's decision hinged on his view that ERISA imposed a high standard of fiduciary duty on the defendants. If he set the hurdle too high, his result could well be wrong. Judge Mishler did not consider that he was exercising discretion in finding that the trustees had violated their fiduciary duties; he regarded that conclusion as compelled. There is no real dispute over what did and what did not occur. The quarrel is over the legal standard and its application to facts not seriously in dispute. Thorough review at this point should be helpful not only to the parties but to the district judge in indicating the points that deserve further exploration at the trial. Moreover, the question here at issue can arise for other companies. We would ill perform our duties by a decision affirming the district court because of limitations on the scope of review, thereby necessarily implying that we would equally have upheld a contrary ruling.

## IV. The Legal Standard

■ We deal first with the contention, advanced by the Secretary in passing, that the result reached by the district judge was compelled on a ground rejected by him, namely, that the trustees, at least in their purchase of Grumman stock, violated the specific prohibitions of § 406(b) of ERISA. The only such prohibition that is arguably applicable is § 406(b)(2), see note 1 *supra*.

We hold that the section does not apply. The "party" that the trustees are claimed to have been acting on the behalf of or to have been representing presumably is Grumman. We read this section of the statute as requiring a transaction between the plan and a party having an adverse interest. Such was the case in the only appellate decision cited to us by the Secretary, *Cutaiar v. Marshall*, 590 F.2d 523, 529 (3 Cir. 1979). This also was true in *Freund v. Marshall & Ilsley Bank*, 485 F.Supp. 629 (W.D.Wis. 1979). *Marshall v. Kelly*, 465 F.Supp. 341 (W.D.Okl.1978) and *Gilliam v. Edwards*, 492 F.Supp. 1255 (D.N.J.1980), also cited by the Secretary, were cases of self-dealing clearly prohibited by § 406(b)(1). We see no reason to think Congress intended the expansive interpretation of the various specific prohibitions of § 406 urged by the Secretary, particularly in light of the inclusion of the sweeping requirements of prudence and loyalty contained in § 404.

---

**7.** Judge Oakes' opinion in the *Nuclear Regulatory* case pointed out that the principle of broader review of the grant or denial of preliminary injunctions where no live testimony was heard is closely related to the view taken by this court in *Orvis v. Higgins*, 180 F.2d 537, 539–40 (2 Cir.) (Frank, J.), *cert. denied*, 340 U.S. 810, 71 S.Ct. 37, 95 L.Ed. 596 (1950), with respect to the diminished effect of F.R.Civ.P. 52(a) in such cases and cited a statement in *Pan American World Airways, Inc. v. Aetna Casualty & Surety Co.*, 505 F.2d 989, 1004 (2 Cir. 1974), that:

> *Orvis* stands for the proposition that a record consisting only of pleadings, depositions, and affidavits may, at the reviewing court's discretion, be reviewed de novo.

However, the *Pan American* case was one where "a great deal of the evidence" consisted of oral testimony, *id.*, and the characterization of the proposition stated by *Orvis* as discretionary thus was dictum.

Sections 404(a)(1)(A) and (B) impose three different although overlapping standards. A fiduciary must discharge his duties "solely in the interests of the participants and beneficiaries." He must do this "for the exclusive purpose" of providing benefits to them. And he must comply "with the care, skill, prudence, and diligence under the circumstances then prevailing" of the traditional "prudent man".

The trustees urge that the mandates of § 404(a)(1)(A) and (B) must be interpreted in the light of two other sections of ERISA. One, is § 408(c)(3), 29 U.S.C. § 1108(c)(3), which permits the appointment of officers of the sponsoring corporation as trustees. The other is § 407(a)(3), 29 U.S.C. § 1107(a)(3), which, as here applicable, permitted the Plan to acquire Grumman stock having an aggregate fair market value not exceeding 10% of the fair market value of the assets of the Plan. This provision, the trustees point out, was the result of a lengthy debate in which the Department of Labor played an important role; they rely especially on the following passage from its statement to the Senate Finance Committee:

> Especially significant among the expressly allowed transactions is that which permits, in most types of plans, investment of up to ten percent of the fund assets in securities issued by the employer of the employees who are participants in the plan. Since such an employer will often be an administrator of his plan, or will function as a trustee or in some other fiduciary capacity, this provision creates a limited exception to the listed proscription against self-dealing. The exception is made in recognition of *the symbiotic relationship* existing between the employer and the plan covering his employees. *Private Pension Plan Reform: Hearings Before the Subcomm. on Private Pension Plans of the Senate Comm. on Finance*, 93 Cong., 1st Sess. 446 (1973) (statement of Department of Labor) (emphasis supplied).

Appellants do not contend that these provisions relieve corporate officers or directors who are trustees of a plan of the duties imposed by § 404(a) when dealing with stock of the corporation which is an asset of the Plan. They argue rather that, despite the words "sole" and "exclusive", such officers or directors do not violate their duties by following a course of action with respect to the plan which benefits the corporation as well as the beneficiaries.

■ We accept the argument but not the conclusion which appellants seem to think follows from it. Although officers of a corporation who are trustees of its pension plan do not violate their duties as trustees by taking action which, after careful and impartial investigation, they reasonably conclude best to promote the interests of participants and beneficiaries simply because it incidentally benefits the corporation or, indeed, themselves, their decisions must be made with an eye single to the interests of the participants and beneficiaries. Restatement of Trusts 2d § 170 (1959); II Scott on Trusts § 170, at 1297–99 (1967) (citing cases and authorities); Bogert, The Law of Trusts and Trustees § 543 (2d ed. 1978). This, in turn, imposes a duty on the trustees to avoid placing themselves in a position where their acts as officers or directors of the corporation will prevent their functioning with the complete loyalty to participants demanded of them as trustees of a pension plan.

■ There is much to be said for the Secretary's argument that the participation of Bierwirth and Freese in the directors' decision of September 25 press release announcing the unanimous decision of the board to do this on the ground, *inter alia*, of its inadequacy; the sending of Bierwirth's letter of September 28 repeating this and also announcing that the LTV offer was a threat to the pension fund; and the other activities of Bierwirth and Freese in opposing the offer precluded their exercising the detached judgment required of them as trustees of the Plan, and that the only proper course was for the trustees immediately to resign so that a neutral trustee or trustees could be swiftly appointed to serve

for the duration of the tender offer.[8] Looking at the matter realistically we find it almost impossible to see how Bierwirth and Freese, after what they had said and done between September 24 and October 7, could have voted to tender or even to sell the Plan's stock, no matter how compelling the evidence for one or the other of those courses might have been.[9] Grumman shareholders who had acted in accordance with the company's pleas would have had every reason to consider such action a breach of faith. Even though the district judge had not seen or heard Freese, he was not required to accept Freese's deposition testimony that his mind "was not absolutely made up" until he got to the October 7 meeting and that he "hadn't predecided" what his answer would be. "[W]e are not to close our eyes as judges to what we must perceive as men." *People ex rel. Alpha Portland Cement Co. v. Knapp*, 230 N.Y. 48, 63, 129 N.E. 202, 208 (1920) (Cardozo, J.), *cert. denied sub nom. State Tax Commissioner v. People ex rel. Alpha Portland Cement Co.*, 256 U.S. 702, 41 S.Ct. 624, 65 L.Ed. 1179 (1921). In this respect, as in others, the case differs vitally from *Withers v. Teachers' Retirement System*, 447 F.Supp. 1248 (S.D.N.Y.1978) (Conner, J.), *aff'd mem.*, 595 F.2d 1210 (2 Cir. 1979), on which the trustees heavily rely.

We are not, however, required to go so far in this case. The record contains specific instances of the trustees' failure to observe the high standard of duty placed upon them. Bierwirth and Freese should have been immediately aware of the difficult position which they occupied as a result of having decided as directors some of the same questions they would have to decide as trustees, and should have explored where their duty lay.[10] Instead the question of a trustees' meeting was treated quite casually—something to be attended to when the hectic pace of fighting the tender offer would permit. One way for the trustees to inform themselves would have been to solicit the advice of independent counsel; Mullan, a junior Grumman employee, was under disabilities similar to those of the trustees themselves. He could hardly have been expected to tell the trustees that the better course would be to resign or even to suggest investigations which might alter the judgment of total commitment to defeating the LTV offer that management had already expressed. We do not mean by this either that trustees confronted with a difficult decision need always engage independent counsel or that engaging such counsel and following their advice will operate as a complete whitewash which, without more, satisfies ERISA's prudence requirement. But this was, and should have been

8. It could be said against this that Bierwirth and Freese were fiduciaries for the Grumman stockholders and that if their actions before the trustees' meeting on October 7 met their duties as such, no harm was done by their prejudgment. However, as Justice Frankfurter observed in a famous passage, "to say that a man is a fiduciary only begins analysis; it gives direction to further inquiry. To whom is he a fiduciary? What obligations does he owe as a fiduciary?" *SEC v. Chenery Corp.*, 318 U.S. 80, 85–86, 63 S.Ct. 454, 458, 87 L.Ed. 626 (1943). The fiduciary obligations of the trustees to the participants and beneficiaries of the plan are those of trustees of an express trust—the highest known to the law. Restatement of Trusts 2d § 2, comment b (1959). The trustees do not even contend that the quick judgment made at the directors' meeting of September 25 satisfied their obligations under § 404(a)(1)(A) and (B). Whether it satisfied their obligations to Grumman shareholders is not before us.

9. We are not impressed with the defendants' argument that they, and particularly Bierwirth, had nothing to fear from the LTV offer in light of LTV's announced intention to make Grumman's office the headquarters of its aerospace division and to retain Bierwirth as C. E. O. of that division. No offer was made with respect to Freese or Paladino. Even as to Bierwirth there have been countless instances where, even when a proposal to retain the chief executive of the target was wholly sincere, he will have disappeared within a year or so. Moreover, being C. E. O. of a division of LTV was *not the same thing as being C. E. O. of an independent Grumman.* The press currently recounts how high corporate executives are equipping themselves with "golden parachutes" providing large benefits in the event that the executive is dismissed or even if he quits on his own volition after a takeover.

10. Bierwirth was a law school graduate and had practiced for 3 years.

perceived to be, an unusual situation peculiarly requiring legal advice from someone above the battle.

The trustees also failed to measure up to the standard required of them in failing to do a more thorough job in ascertaining the facts with respect to the LTV pension funds, the unfunded liabilities of which were to be a principal ground for their action, and investigating whether anything could be done to protect the Grumman pension fund in the event of an acquisition of Grumman by LTV. So far as the record show, the sole knowledge the trustees had of the LTV pension plans came from two portions of the prospectus for the May 28, 1981, LTV stock offering which we set forth in the margin.[11] The September 28 letter from Bierwirth to Grumman's shareholders drew on the prospectus' statement about unfunded liabilities but eliminated the phrase "which relates primarily to unfunded vested pension liabilities assumed in the purchase of Lykes". The omission of this clause was important because it created the false impression, on the basis of which the trustees could well have acted, that LTV had a single pension fund which had unfunded liabilities in the considerable amount stated. If, as the prospectus fore-shadowed and investigation would have confirmed, the unfunded liabilities were principally in pension funds covering hourly employees of LTV's steel operations,[12] the danger of these plans being merged with Grumman's was considerably less than if LTV had a single underfunded pension fund.

The trustees' perception of danger would have been reduced yet further had they known that LTV treated a number of the 21 pension plans which it sponsored quite well. For example, the pension plan for salaried Vought employees was extremely well-funded, with an excess of current assets over vested liabilities of approximately $78,000,000. Other Vought plans, including one covering hourly workers, had not been treated so favorably, but nonetheless were in better financial condition than LTV's plans for employees in the steel industry. The means for the trustees to conduct speedy investigation were readily at hand. The trustees knew that LTV was obliged to file with the Internal Revenue Service and the Secretary of Labor reports (Form 5500's) with respect to each of its pension funds. They made no effort to examine these. Counsel tells us that examination of the reports would have shown the unfunded

---

11. Retirement Plans

The Company has retirement plans covering substantially all of its employees. It is the policy to accrue retirement costs, including amortization (primarily over 40 years) of prior service costs. Contributions are made to Company sponsored retirement plans in accordance with the minimum funding requirements of the Employee Retirement Income Security Act of 1974, and to multi-employer plans as required by collective bargaining agreements for the Company's seagoing, longshore and mining employees.

Note G—Employee Compensation and Benefits

Included in the noncurrent liability for employee compensation and benefits was approximately $225,000,000 and $227,000,000 at December 31, 1980 and 1979, respectively, which relates primarily to unfunded vested pension liabilities assumed in the purchase of Lykes.

Costs under retirement plans were $167,-600,000 in 1980, $167,300,000 in 1979 and $95,100,000 in 1978. The accumulated plan benefits and plan net assets for the Company's defined benefit plans as of the most recent date (January 1, 1980) were as follows (in thousands):

| | |
|---|---|
| Actuarial present value of vested accumulated plan benefits | $1,322,313 |
| Net assets available for plan benefits | 1,273,505 |
| Excess | $ 48,808 |
| Actuarial present value of nonvested accumulated plan benefits | $ 166,059 |

The weighted average assumed rate of return used in determining the actuarial present value of accumulated plan benefits was 10 percent. The actuarial present values of accumulated plan benefits of the Company's seagoing, longshore and mining employees covered by multi-employer plans are not currently determinable.

As mentioned above, similar information appeared in LTV's annual report and its other publicly available filings.

12. Even at the time of his deposition Paladino did not know which of LTV's plans had the unfunded liabilities.

liabilities to have been even greater than disclosed in the prospectus, an aggregate of approximately $378,000,000 rather than $225,000,000, as of December 31, 1980. Apart from Judge Mishler's observation that "Luck or good fortune is no substitute for a trustee's duty of inquiry," the investigation would have shown also that LTV maintains separate pension plans for employees in different industries and some 93% of the unfunded liabilities were in the pension funds covering LTV's steel operations, which there would have been reasons to believe posed little danger to the Grumman Plan.[13] Further inquiry in these areas, as well as those mentioned immediately below, might well have changed the trustees' views regarding both the danger presented by LTV's offer to the Plan and their ability to obtain satisfactory protections from LTV for the Plan. In addition, even if the trustees' beliefs regarding the financial condition of LTV's pension plans and LTV's policies towards its plans had been entirely accurate, we see little in the record to indicate that they attempted to determine just what LTV could have done and could not have done to inflict financial harm upon the participants in Grumman's Plan.[14] The trustees easily could have retained an expert on ERISA to advise them on this subject.

The trustees were also too cavalier in their treatment of public statements by LTV that it did not intend to touch the Plan. To be sure, as Bierwirth testified, very few assurances could be proof against serious financial difficulties of LTV. Nonetheless, the trustees were bound to take LTV up on its statements and see how far, if at all, it was willing to place these in binding form. If it was, that would have gone at least part of the way in alleviating the trustees' concerns; if it was not, its refusal would have confirmed them. It is true that even if LTV had been completely forthcoming the trustees might still have been justified in concluding that its debt-ridden balance sheet was a sufficient basis for concern, but they would have reached that conclusion after having made every reasonable effort to see how much protection LTV would have afforded—a question which likely can no longer be answered. See *Withers v. Teacher's Retirement System, Inc., supra*, 447 F.Supp. at 1259.

However, we are not obliged to decide whether the district court would have been justified in awarding preliminary injunctive relief on these facts alone. An even more telling point against the trustees is their swift movement from a decision not to tender or sell [15] the shares already in the fund to a decision to invest more than $44,000,000 in the purchase of additional Grumman shares up to the 10% maximum permitted by § 407(a)(2) of ERISA. Their argument is that once they had reasonably decided not to tender the shares already in the fund since success of the offer would run counter to the interests of the beneficiaries, it followed that they should do everything else they lawfully could do to thwart the offer. This, however, should have involved a calculation of the risks and benefits involved. Bierwirth properly conceded that a further investment in Grumman shares had

---

**13.** The trustees might also have inquired whether, as an affidavit submitted on behalf of the Secretary asserts, Joint App. 164a–65a, the unfunded liabilities relating to LTV's steel operations were attributable to causes other than LTV's particular policies.

**14.** Counsel for the trustees argue that LTV could have merged the Grumman plan with an LTV plan, appointed new trustees, terminated the Grumman plan, and so forth. ERISA, of course, contains elaborate safeguards to protect employees from the financial consequences of such actions, *e.g.*, 29 U.S.C. §§ 1058, 1342, 1344; IRC §§ 411, 412, 414. Counsel for the trustees have not suggested how LTV could

have avoided such safeguards, much less that the trustees seriously considered these factors in making their decision at the October 7 meeting.

**15.** The record does not indicate that sale was even considered, although that course had some attractions. It would have eliminated the possibilities that if the Plan did not tender and the offer succeeded, the Plan might be left as a minority stockholder in an LTV controlled Grumman, and that, if the Plan did tender and the offer succeeded, the Plan might be left with some Grumman stock, because of the 70% maximum in the tender offer.

to be "the right thing for us to do." The trustees' consideration of this was woefully inadequate. Although Grumman shares may have seemed attractive when selling in the high 20's, with what appeared a good chance of appreciation, see note 6 *supra* and accompanying text, they were not necessarily attractive when, under the impetus of the tender offer, they had risen to the high 30's. Moreover, and even more important, in purchasing additional shares when they did, the trustees were buying into what, from their own point of view, was almost certainly a "no-win" situation. If the LTV offer succeeded, the Plan would be left as a minority stockholder in an LTV-controlled Grumman—a point that seems to have received no consideration. If it failed, as the Plan's purchase of additional 8% of the outstanding Grumman stock made more likely, the stock was almost certain to sink to its pre-offer level, as the trustees fully appreciated. Given the trustees' views as to the dim future of an LTV-controlled Grumman, it is thus exceedingly difficult to accept Bierwirth's testimony that the purchase of additional shares was justified from an investment standpoint—or even to conclude that the trustees really believed this. Investment considerations dictated a policy of waiting. If LTV's offer were accepted, the trustees would not want more Grumman shares; if it failed, the shares would be obtainable at prices far below what was paid. Mid-October 1981 was thus the worst possible time for the Plan to buy Grumman stock as an investment.[16] It is almost impossible to believe that the trustees did not realize this and that their motive for purchasing the additional shares was for any purpose other than blocking the LTV offer. Moreover, even if we were to make the dubious assumption that a purchase for this purpose would have been permissible despite all the investment risks that it entailed, the trustees should at least have taken all reasonable steps to make sure the purchase was necessary. As indicated, Bierwirth was under the impression that the necessary 50.01% would not be tendered— an expectation not unnatural in view of the fact that Grumman's investment and pension plans already owned nearly a third of the shares—although he could not be sure. The record gives no explanation why, if additional shares were to be purchased, this could not have been done by Grumman, in some way that would not reduce the number of outstanding shares, with the bank credit Freese had negotiated in part for that very purpose, rather than by the Plan. There is also nothing to indicate that the trustees, or other Grumman officers or directors, had been willing to risk their own funds in buying additional Grumman shares in the interval before the Plan was free to act. While the trustees did wait over the week-end of October 10 and 11 to see whether the judge's decision on Grumman's application for a preliminary injunction would come down, there is nothing to indicate any effort to ascertain from the judge's chambers when this could be expected, although such an inquiry would have been entirely proper. To be sure, the trustees could not have foretold what the decision would have been but if they had known that it was expected to be filed on October 14, they could well have decided to postpone the expenditure of $44,000,000 of the Plan's money in buying Grumman shares even if denial of the injunction might have somewhat increased the price of the stock.

We do not join in all of the district judge's pejorative adjectives concerning the

---

**16.** The judge was not bound to accept the trustees' claim that purchases of considerable amounts of Grumman stock could not be made (and that their failure to purchase Grumman stock earlier although their belief in its attractiveness was claimed to go back to the summer of 1981 was thereby explained) on the ground that, with a daily volume of only 20,000 shares, substantial purchases would have greatly increased the price. No expert testified to that effect and no explanation was offered how the Plan had managed to accumulate 525,000 shares when, as Bierwirth stated, the market had been much thinner. Even if we assume that a carefully executed buying program would have somewhat boosted the price, there was no testimony that this would have been anything like the increase of ten points that had resulted from LTV's $45 offer.

trustees. They were caught in a difficult and unusual situation—apparently, so far as shown in the briefs, one that had not arisen before. We accept that they were honestly convinced that acquisition of Grumman by the debt-ridden LTV would mean a less bright future for Grumman and also that an LTV acquisition posed some special dangers to the participants of the Plan.[17] However, they should have realized that, since their judgment on this score could scarcely be unbiased, at the least they were bound to take every feasible precaution to see that they had carefully considered the other side, to free themselves, if indeed this was humanly possible, from any taint of the quick negative reaction characteristic of targets of hostile tender offers displayed at the September 24 board meeting, and particularly to consider the huge risks attendant on purchasing additional Grumman shares at a price substantially elevated by the tender offer. We need not decide whether even this would have sufficed; perhaps, after the events of late September, resignation was the only proper course. It is enough that, for the reasons we have indicated, as well as others,[18] the district judge was warranted in concluding, on the materials before him, that the trustees had not measured up to the high standards imposed by § 404(a)(1)(A) and (B) of ERISA. How the situation will appear after a trial is a different matter which we cannot now decide.

### Relief

■ Not seriously disputing that if interlocutory relief is to be granted, the preliminary injunction embodied in Part I of the court's order of January 13, 1982, was appropriate, the trustees challenge the propriety of Part II directing the appointment of an Investment Manager to act as receiver *pendente lite*. They insist that the Invest-

ment Manager is in fact a partial trustee; that, under § 7.01 of the Plan and §§ 2(c) and 10 of the Trust Agreement, new trustees can be appointed only by the Grumman board; and that the proposal for the appointment by the nonmanagement directors of three of their number as interim trustees filled whatever need there was to replace the existing trustees.

Although ERISA does not provide specifically for the appointment of a receiver in an action by the Secretary under § 1132(a)(5), such power is conferred by the provision authorizing him to seek "other appropriate equitable relief." See *Marshall v. Snyder*, 572 F.2d 894, 901 (2 Cir. 1978). The contention that in exercising this power a court is constrained by the provisions of a plan does not require comment. See Restatement of Trusts 2d § 199d, Comment d (1959). Still the appointment of a receiver is a harsh remedy, not to be imposed without a showing of necessity.

We fail to see why Part I of the order of January 11, 1982, does not sufficiently protect the situation during the interval before final judgment can be entered. This enjoins the trustees from "buying, selling or exercising any powers, rights or other duties on behalf of said Pension Plan regarding stock or other securities issued by the Grumman Corporation except upon the further Order of this Court," which, we assume, would have to be made on notice to the Secretary. We also read the order as preventing a decision not only to tender but a decision not to tender, except upon the further order of the court, if there should be a new tender offer; if the Secretary considers this to be doubtful and the trustees should refuse to make an appropriate stipulation, the court can clarify its order. The financial integrity of the trustees is not questioned, as is demonstrated by the

---

**17.** These dangers included the low level of pension benefits allegedly maintained by LTV; the fact that while LTV complied only with the minimum funding requirements of ERISA, Grumman contributed the impliedly higher amount of the maximum amount deductible under the IRC; the fact that LTV could merge or terminate the Plan; the near certainty that

LTV would appoint new trustees for the Plan; and the danger that, even if it had the best of intentions towards the Grumman Plan, LTV's financial condition might preclude it from treating the Plan favorably.

**18.** For example, the sudden desire for indemnity before the purchase was authorized.

court's willingness that they continue to act as such with respect to more than 90% of the Plan's assets. The only added benefits from the appointment of an Investment Manager are that he would be free to take initiatives, e.g., selling Grumman securities, that might not be taken by the trustees; that the presence of the Investment Manager might stimulate a new and advantageous tender offer; and that if such an offer should be made, which no one has suggested to be likely, the Manager would be in place. These benefits do not warrant the disruption and expense which the appointment would cost for what should be a short period. We therefore modify the order by striking Part II, without prejudice to the right of the Secretary to move for relief similar to that therein provided if there should be another tender offer prior to the entry of final judgment.

The order is modified as stated in the foregoing portion of this opinion and, as so modified, is affirmed. The Secretary may recover 80% of his costs.