ULICO CASUALTY COMPANY,
Plaintiff,

v.

CLOVER CAPITAL MANAGEMENT,
INC., Defendant,

No. 3:00–CV–773.

United States District Court,
N.D. New York.

Sept. 4, 2002.

Proskauer Rose LLP, New York City (Myron D. Rumeld, of counsel), for plaintiff.

Wolford & LeClair LLP, Rochester, NY (Steven E. Cole, of counsel), for defendant.

## MEMORANDUM DECISION AND ORDER

MUNSON, Senior District Judge.

Plaintiff Ulico Casualty Company ("Ulico"), instituted this lawsuit against Defendant Clover Capital Management, Inc.("Clover"), under §§ 404(a)(1)(B); 404(a)(1)(D); and 405(a)(2) of the Employment Retirement Income and Security Act ("ERISA"), 29 U.S.C §§ 1104(a)(1)(B); 1104(a)(1)(D); and 1105(a)(2). The complaint demands judgment for over eight million dollars in losses suffered by three pension funds allegedly occasioned by Clover's breach of its fiduciary duties and state common law breach of contract when it sold collateralized mortgage obligation and real estate mortgage investment bonds conduit bonds, known as Z-bonds held by certain pension plans. The state common law breach of contract cause of action was dismissed as preempted by ERISA as part of a decision made May 11, 2001, by the Hon. Thomas J. McAvoy in a prior summary judgment motion made in this case.

The Laborers International Union of North America Local 35 Pension Fund, Local No. 322 Pension Fund and the Carpenters Local No. 120 Pension Fund (the "Funds") are employee pension benefit plans within the meaning of 29 U.S.C. § 1002(2)(A), the Funds and their trustees had been issued fiduciary liability insurance coverage policies by Ulico.

From 1988 to 1995, the trustees of the Funds retained W.J. Nolan & Company ("Nolan"), a broker in mortgage backed securities, to invest in fixed income securities on behalf of the Funds. Starting in 1992 and proceeding through 1994, Nolan acquired Z-bonds or Collateralized Mortgage Obligations ("CMOs") as they are otherwise know, for each of the Funds. At the end of 1994, the Funds portfolio of investments purchased by Nolan consisted principally of Z-bonds. In 1994, the market value of Z-bonds dropped substantially.

During the first quarter of 1995, the Funds' trustees retained other managers for their Nolan portfolios. Local 35 retained Clover and Loomis, Sayles & Company and, Local 120 retained Clover, Loomis and HGK Asset Management. Local 322 retained Clover, and, when the Nolan account was liquidated, to transfer one million dollars of its share of the proceeds to Manning & Napier, Local 322's current investment manager.

In January 1995, after Clover had evaluated all the Nolan Z-bonds in the various management portfolios, the Funds' principals requested Clover to liquidate the Nolan Z–Bonds and transfer the proceeds pro rata to the other invest managers as soon as possible. Clover then sold the Z–Bonds at a significant loss to the Funds. In 1998, the United States Department of Labor ("DOL") investigated the result of the Z-bond sales and commenced lawsuits against the Trustees for breaching their fiduciary duties and sought recovery of all losses to the Funds attributable to the Z-bond investment.

The Trustees entered into Consent Decrees with the DOL, that discontinued the lawsuits and provided that the Trustees would make payments to the funds in the amount of $3 million, plus a 20% penalty under 29 U.S.C. § 1132(1). Ulico took responsibility for the defense of the DOL lawsuits, the $3 million in settlement expenditures, and the $600,000 penalty. Ulico and the trustees then executed a settlement agreement which provided, *inter alia*, that the Trustees assigned, transferred, and conveyed to Ulico all claims, causes of action, rights and recoveries against all parties responsible for the losses sustained by the Funds including but not limited to Clover ... based upon, or arising from Clover's management and sale of the Z-bonds referred to in the DOL action. Ulico thereupon started the instant action against Clover.

Currently before the court is Clover's motion for summary judgment pursuant to Rule 56 of the Fed. R. Civ. P seeking dismissal of the complaint, and for an order precluding the testimony of plaintiff's expert witness. Plaintiff has entered opposition to these motions

## DISCUSSION

Rule 56 of the Federal Rules of Civil Procedure permits summary judgment where the evidence demonstrates that "there is no genuine issue of any material fact and the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986). Summary judgment is properly regarded as an integral part of the Federal Rules as a whole, which are designed to "secure the just, speedy and inexpensive determination of every action." *Celotex*

*Corp v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1991)(quoting Federal Rule of Civil Procedure 1). In determining whether there is a genuine issue of material fact a court must resolve all ambiguities and draw inferences against the moving party. *United States v. Diebold,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)(*per curiam* ). An issue of credibility is insufficient to preclude the granting of summary judgment. Neither side can rely on conclusory allegations or statements in affidavits. The disputed issue of fact must be supported by evidence that would allow a "rational trier of fact to find for the non-moving party." *Mashusita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Unsupported allegations will not suffice to create a triable issue of fact. *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995). Nor will factual disputes that are irrelevant to the disposition of the suit under governing law preclude any entry of summary judgment. *Anderson,* 477 U.S. at 247, 106 S.Ct. at 2509.

■ Fiduciaries under ERISA are obligated to discharge their duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in his conduct of an enterprise of like manner of a like character and with like aims." 29 U.S.C. § 1104(1)(B). The source of the standard set forth in this section is the objective "prudent person" standard developed in the common law of trusts. *Katsaros v. Cody,* 744 F.2d 270, 279 (2d Cir. 1984); *cert. denied sub nom, Cody v. Donovan,* 469 U.S. 1072, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984).

■ ERISA's prudence standard "is not that of a prudent person but rather that of a prudent fiduciary with experience dealing with a similar enterprise." *United States v. Mason Tenders District Council of Greater New York,* 909 F.Supp. 882, 886 (S.D.N.Y.1995)(quoting *Marshall v. Snyder,* 1 Empl. Ben. Cases (BNA) 1878, 1886 (E.D.N.Y.1979)). In enacting ERISA, "Congress made more exacting the requirements of the common law of trusts relating to employee benefit trust funds." *Donovan,* 716 F.2d at 1231–32; *Reich v. Valley National Bank of Arizona,* 837 F.Supp. 1259, 1273 (S.D.N.Y.1993)(ERISA is a more stringent version of the prudent person standard than in the common law). *Rice v. Rochester Laborers' Annuity Fund,* 888 F.Supp. 494, 499 (W.D.N.Y. 1995); *Donovan v. Bierwirth,* 680 F.2d 263, 272 n. 8 (2d Cir.) *cert. denied,* 459 U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982)(duties of an ERISA fiduciary are the highest known in law).

> ["T]he prudence rule does not make the fiduciary insure the plan's assets or of the success of the investments. ERISA does not require that a pension take no risk with its investments. Virtually every investment entails some degree of risk, and even the most carefully evaluated investments can fail while unpromising investments may succeed."

*Marshall v. Glass/Metal Association and Glaziers & Glassworkers Pension Plan,* 507 F.Supp. 378, 384 (D.Haw.1980), aff'd. 895 F.2d 729 (11th Cir.1990). However, the fiduciary's subjective, good faith belief in an investment does not insulate him from charges that he acted imprudently. *Donovan v. Bierwirth,* 538 F.Supp. 463, 465 (E.D.N.Y.1981).

■ ERISA's prudent person standard has been interpreted by the courts as an objective standard requiring (1) to employ proper methods to investigate, evaluate and structure the investment; (2) to act in a manner as would others who have

a capacity and familiarity with such matters; and (3) to exercise independent judgment when making investment decisions. *Mason Tenders*, 909 F.Supp. at 886; *Lanka v. O'Higgins*, 810 F.Supp. 379, 387 (N.D.N.Y.1992). This standard requires that the fiduciary's behavior be measured against the standards in the investment industry. *Lanka*, 810 F.Supp. at 387. In evaluating whether a fiduciary acted prudently under ERISA, the court should inquire whether the fiduciaries "at the time they engaged in the challenged transaction, employed the appropriate methods to investigate the merits of the investment and to structure the investment." *Katsaros*, at 279. In other words, if trustees order an investment manager to make particular actions regarding investments, "[the] fiduciary obligations of an investment manager to a plan require it to exercise independent, professional judgment and to insure that investments of assets entrusted to it are based upon such judgments. If the judgment in question is not its own, the investment manager should avoid any connection with that transaction, so that it's clear which party bears the duty of care. Under ERISA, an investment manager's fiduciary obligations may not be turned on and off like running water. ERISA's purpose of clearly locating legal obligations will be vitiated if plaintiffs are required to engage in an after-the-fact sorting out of actions, statements and states of minds among possible fiduciaries to determine which is legally responsible." *Lowen v. Tower Asset Management, Inc.*, 829 F.2d 1209, 1219 (2d Cir.1987).

Clover has moved to exclude the reports submitted by Ulico's expert, Andrew S. Carron, in connection with the summary judgment motion.

The standard for the admissibility of expert testimony is found in Federal Rule of Evidence 702 which states in pertinent part: If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

■ This standard was the subject of extensive analysis in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). There, the Supreme Court held that the trial judge is to act as a gatekeeper regarding expert testimony to insure that such testimony is both relevant and reliable. *Daubert*, 509 U.S. at 589–91, 113 S.Ct. 2786: see *Kumho Tire*, 526 U.S. at 147, 119 S.Ct. 1167, 143 L.Ed.2d 238 (extending *Daubert's* "gatekeeping obligation" to expert testimony other than scientific testimony). The determination as to the relevance and reliability of such evidence is committed to the sound discretion of the trial court. *Daubert*, 509 U.S. at 591, 113 S.Ct. at 2786.

■ *Daubert* identified four specific factors which the trial court may use in determining reliability: (1) whether the theory has been or can be tested; (2) whether the theory has been subject to peer review or been published; (3) when a particular technique is used, that technique's known rate of error; and (4) the extent of the acceptance of the theory in the relevant scientific community. 509 U.S. at 593–94, 113 S.Ct. at 2786. The *Daubert* test is pliant, however, and this "list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Kumho Tire*, 526 U.S. at 158, 119 S.Ct. 1167. The trial court is to use its discretion to determine what are reason-

able criteria of reliability and whether the proposed testimony meets those criteria based on the particularities of the case before it. *Id.;* see generally Federal Judicial Center, *Reference Manual on Scientific Evidence,* 21 (2d ed.2001)(noting that in *Kumho Tire* the Supreme Court was "less absorbed ... in formulating general rules for assessing reliability ... and more concerned about directing judges to concentrate on the 'particular circumstances of the particular case at issue.' This flexible non-doctrinaire approach is faithful to the intention of the drafters of the Federal Rules of Evidence[ ].")

 In assessing reliability, the court must decide whether the expert's testimony has a "traceable, analytical basis in objective fact." *Bragdon v. Abbott,* 524 U.S. 624, 653, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998). "Opinion evidence that is connected to existing data only by the *ipse dixit* of the expert" should not be admitted. *Kumho Tire,* 526 U.S. at 157, 119 S.Ct. 1167.

Clover contends that the proposed testimony of Ulico's expert, Andrew S. Carron, as set forth in his reports is not based on reliable facts or data, he is unqualified to testify concerning portfolio management or the execution of Z–Bond/CMO trades, his testimony will not be able to assist the trier of fact to reach accurate results, and his opinions are not the product or reliable methodology.

 Andrew S. Carron is qualified to testify regarding portfolio management and trading in Z–Bonds/CMOs. He has extensive background and qualifications in analyzing bonds from the prospective of investors, and he is trained in and familiar with the principles and methodologies used by professional fixed income portfolio managers to evaluate bonds including limited risks and security features. Additionally, he has published several articles relating to Z–Bonds /CMOs, and has been qualified at trials as an expert on mortgage-backed securities and investment prudence under the ERISA standard. He has provided expert testimony and/or reports in almost fifty appearances before state and federal courts and administrative agencies and committees of the U.S. House and Senate. Clover's claim that Carron is not qualified suggests that only someone who specializes in Z–Bonds/CMOs could qualify as an expert on the subjects about which Carron proposes to testify. The law does not insist on such narrow qualifications. *McCullock v. H.B. Fuller Co.,* 61 F.3d 1038, 1043 (2d Cir.1995). *"Daubert* does not require that a party who proffers expert testimony carry the burden of proving to the judge that the expert's assessment of the situation is correct." *Ruiz–Troche v. Pepsi Cola of Puerto Bottling Co.,* 161 F.3d 77, 85 (1st Cir.1998).

 Carron's testimony is sufficiently reliable to be admitted at trial. In his comprehensive report and opinions, he examined and explained in detail the characteristics, performance and structure of Z–Bonds, the results of their sale and possible alternatives thereto. His critical review of Clover's performance reached the following conclusions.

Clover's sale of the Funds' Z–Bonds was inappropriate because their value had been depleted at that time by the chaos in the bond market caused by rising interest rates; Clover, by selling the Zbonds and investing the proceeds in securities with lower yields and a worst risk-return yield profile, violated the principle of "relative selling," i.e., the evaluation of the attractiveness of one instrument relative to another measured in terms of risk. Additionally, there was no indication of the existence of a situation where cash was immediately needed by the Funds requir-

ing a sale of the Z–Bonds under the early 1995 market conditions. Nor was there any pressing need to divide and transfer the sale proceeds to the Funds other investment managers, Clover could have secured market value data for the securities and transferred enough securities to the other managers to meet the Funds' wants. Clover could have accomplished the desired result without some or all of the Z–Bond sales by partial sale and re-investment in short term assets, hedging against rising interest rates by pursing financial derivatives such as interest rate options.

If the Z–Bonds had been held unto the present, they would have produced substantial interest accruals and some price appreciation. The total return would have been higher then that of the index of bond market returns. Even if the Z–Bonds had been sold over a period of time, a higher return could have been realized because sales of large blocks of bonds results in a lower price, and, over time, the bond market conditions improved.

▆▆▆▆ Courts in this Circuit have emphasized that "liberality and flexibility in evaluating qualifications should be the rule" in applying *Daubert* standards. *Lappe v. American Honda Motor Co.,* 857 F.Supp. 222, 226 (N.D.N.Y.1994), aff'd 101 F.3d 682, 1996 WL 170209 (2d Cir.1996). The Second Circuit has also distinguished challenges based on the experts lack of qualifications in the relevant field, or reliability of the expert's testimony, from attacks on the weight and credibility of the opinion. Attacks relating to faults in the experts methodology and lack of textual authority for the opinion all are improper criteria for advancing a motion under 702. *McCullock,* 61 F.3d at 1043–44 (2d Cir. 1995); *Glaser v. Thompson Medical Co.,* 32 F.3d 969, 975 (6th Cir.1994)(differences in opinions among experts, including the "decision to rely on certain studies rather

than others," go to the weight and credibility, and thereby create material questions of fact). "[D]isputes as to the strength of [the witnesses's] credentials, faults in his use of differential etiology as a methodology, or lack of textual authority for his opinion go to the weight, not the admissibility, of testimony." *McCullock,* 61 F.3d at 1044.

Rule 56 "contemplates a rudimentary almost one dimensional, exercise geared to determining whether the nonmovant's most favorable evidence and the most flattering inferences which can reasonably be drawn therefrom are sufficient to create an authentic question of material fact. Among other things, apart from that which may be inherently incredible, the non moving party is entitled 'to have the credibility of the evidence as forecast assumed, his version of all that is in dispute accepted, [and] all internal conflicts in [the evidence] resolved favorable to him ....'" *Greenburg v. Puerto Rico Maritime Shipping Authority,* 835 F.2d 932, 936 (1st Cir.1987)(quoting, *Charbonnages de France v. Smith,* 597 F.2d 406, 414 (4th Cir.1979)).

"[W]hen the facts support plausible but conflicting inferences on a pivotal issue in the case, the judge may not choose between those inferences at the summary judgment stage." *Coyne v. Taber Partners I,* 53 F.3d 454, 460 (1st Cir.1995); *(United States v. Kayne,* 90 F.3d 7, 12 (1st Cir.1996))(stating that disagreement among experts are "properly the subject of searching cross-examination" at trial), *cert. denied,* 519 U.S. 1055, 117 S.Ct. 681, 136 L.Ed.2d 607 (1997).

▆▆▆ The pivotal fact to be determined in the case at bar is whether Clover's sale of the Z–Bonds/CMOs met ERISA's prudent person requirements for such sales. It is obvious that the experts of the respective parties strongly disagree on this

pivotal fact. Additionally, fact questions remain regarding whether Clover was a fiduciary with respect to those portions of the Z–Bonds that were transferred to other investment managers, and the measurement of what losses, if any, were sustained by Ulico as a result of the Z–Bond sale. In this situation, summary judgment should not be granted, and, therefore, this court will not do so. *Sears, Roebuck & Co. v. General Services Administration*, 553 F.2d 1378, 1382 (D.C.Cir.), *cert denied*, 434 U.S. 826, 98 S.Ct. 74, 54 L.Ed.2d 84 (1977).

Accordingly, Clover's motions for summary judgment and to exclude the testimony of Ulico's expert witness are **DENIED.**

**IT IS SO ORDERED.**