Chrystina NICOLAOU, Plaintiff–
Appellant,

v.

HORIZON MEDIA, INC.,
Defendant–Appellee.

Docket No. 03–9186.

United States Court of Appeals,
Second Circuit.

Argued: July 13, 2004.

Decided: March 28, 2005.

Daniel J. Kaiser (Henry J. Saurborn, Jr., on the brief), Kaiser Saurborn & Mair, P.C., New York, NY, for Plaintiff–Appellant.

Laura H. Allen (Nicholas H. DeBaun, Nilufer Loy, Chad Edgar, on the brief), Sidley Austin Brown & Wood LLP, New York, NY, for Defendant–Appellee.

Gail Ann Perry, Trial Attorney, U.S. Dept. of Labor (Howard M. Radzely, Solicitor of Labor, Timothy D. Hauser, Associate Solicitor, and Elizabeth Hopkins, Counsel for Special Litigation, on the brief), Washington, D.C., for Amicus Curiae Secretary of Labor.

Before: POOLER, SACK, and RAGGI, Circuit Judges.

PER CURIAM.

## BACKGROUND [1]

The defendant in this action, Horizon Media, Inc. ("Horizon"), is a New York corporation with its principal place of business located in New York City. ¶ 2. The plaintiff, Chrystina Nicolaou, was hired by Horizon in July 1998 as its Director of Human Resources and Administration. ¶ 6. In this capacity, Nicolaou served as a fiduciary and trustee of Horizon's 401(k) employee benefits plan ("the Plan"), which is regulated by the Employee Retirement and Income Security Act, 29 U.S.C. §§ 1001–1461. ¶ 9. Nicolaou was also a participant in the Plan. ¶ 9.

Shortly after she began working at Horizon, Nicolaou "discovered a serious payroll discrepancy involving underpayment of overtime to all non-exempt employees of the [New York City] and Los Angeles offices." ¶ 10. This "discrepancy" had apparently existed for more than a decade, resulting in what the complaint terms "a historical under funding of Horizon's 401(k) plan." ¶¶ 13, 20. Nicolaou immediately brought this problem to the attention of Jerry Riley, Horizon's Chief Financial Officer, who advised her to let the matter drop. ¶¶ 8, 11. She then raised the issue on two occasions with Stewart Linder, Horizon's Controller, who declined to address it. ¶¶ 8, 12, 14–17.

By October 1999 Nicolaou became "convinced that Horizon was unwilling to rectify" the funding problem. ¶ 18. She therefore contacted Mark Silverman, who is identified in the complaint simply as "an attorney for Horizon," in the hope "that Horizon would finally address the overtime issue by conducting an investigation into the issue." ¶ 18. Silverman in fact "expressed enormous concern regarding how detrimental the information was" and Nicolaou "promised to remain available to assist or provide additional information in connection with the investigation." ¶¶ 22–23. Silverman apparently undertook his own inquiry into the funding problem, upon the conclusion of which he told Nicolaou that "he had confirmed her findings concerning the payroll issue." ¶ 25.

During November 1999 Nicolaou and Silverman met with William Koenigsberg, the President of Horizon. ¶¶ 8, 26. We note that the amended complaint does not specify by whom this meeting was arranged. It is clearly alleged, however, that in addition to informing him of the existence of the payroll discrepancy, Silverman urged Koenigsberg to see that the problem would be promptly rectified. ¶¶ 27–29. Koenigsberg, however, made no such commitment during the meeting, but instead "appeared disturbed . . . and not at all pleased that this issue was being brought to his attention." ¶ 30.

The amended complaint alleges that a campaign of retaliation was then initiated against Nicolaou. "Within days" of the meeting just described, "Koenigsberg announced that he was bringing a 'real' Human Resources professional into the organization that [sic] would report directly to him." ¶ 32. Soon afterward, "Nicolaou was formally advised that she was being replaced as the Director of Human Resources and Administration and that her job title would thereafter be Office Manager." ¶ 36. Horizon subsequently hired two individuals, who together assumed virtual-

1. Our discussion of the facts is taken from the allegations contained in the amended complaint, filed on April 24, 2001, which are presumed to be true only for the purposes of this discussion. References to the amended complaint are cited as "¶ ___."

ly all of Nicolaou's former responsibilities. ¶¶ 37–40. This process of what the amended complaint characterizes as "professional trashing" ended with Nicolaou being terminated by Horizon on November 7, 2000. ¶ 44.

Nicolaou filed her initial complaint in this action on January 31, 2001, and, as already noted, filed an amended complaint on April 24, 2001. The amended complaint states two causes of action for illegal retaliation arising from its allegations that Horizon demoted and eventually terminated Nicolaou after she had raised concerns about Horizon's funding of its 401(k) plan: (1) a violation of Sections 15 and 16 of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201–219, and (2) a violation of Section 510 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001–1461. ¶¶ 48, 51.

Horizon moved to dismiss the amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). The district court granted this motion in an unreported opinion, entered on September 25, 2003. The court held that Nicolaou had no cause of action under FLSA because Sections 15 and 16 do not make it illegal for a firm to retaliate against an employee for bringing complaints within the firm; those provisions only make it illegal for a firm to retaliate against an employee who has filed a formal complaint with a regulatory agency, or who has taken part in a regulatory agency's proceeding against the firm. The district court dismissed Nicolaou's ERISA claim because it construed the amended complaint as seeking only damages, and not equitable relief, as required by the statute. *See* 29 U.S.C. § 1132(a)(3).

Nicolaou moved for reconsideration of the district court's dismissal of her ERISA claim after informing the court by letter that the amended complaint in fact seeks injunctive relief in the form of reinstatement of her employment with Horizon. The district court issued an opinion in response, entered on October 15, 2003, which agreed that reconsideration was warranted, but went on to again dismiss the ERISA claim. The opinion concludes that, as with FLSA, " § 510 of ERISA does not protect an employee who participates in an internal inquiry, [and because Nicolaou] has not alleged that she participated in a protected activity [she] therefore has failed to state a cause of action under ERISA." *Nicolaou v. Horizon Media, Inc.,* No. 01 Civ. 0785, 2003 WL 22852680, at *3, 2003 U.S. Dist. LEXIS 18341, at *9 (S.D.N.Y. Oct.15, 2003).

## DISCUSSION

Our review of a district court's dismissal of a complaint under Rule 12(b)(6) is *de novo.* *See Ontario Pub. Serv. Employees Union Pension Trust Fund v. Nortel Networks Corp.,* 369 F.3d 27, 30 (2d Cir.2004). Nicolaou has elected to only appeal the dismissal of her claim under Section 510 of ERISA.

Section 510 of ERISA, codified at 29 U.S.C. § 1140, reads in relevant part as follows:

> It shall be unlawful for any person to discharge, fine, suspend, expel, or discriminate against any person because he has given information or has testified or is about to testify in any inquiry or proceeding relating to this chapter . . . .

Other federal statutes contain provisions which prevent employers from retaliating against employees who have raised an issue concerning the employer's compliance with the regulatory program set forth in the statute. It is useful to compare the language of Section 510 with the analogous "whistleblower provisions" of FLSA and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e–17. Section

15(a)(3) of FLSA, codified at 29 U.S.C. § 215(a)(3), makes it unlawful

> to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding.

Section 704(a) of Title VII, codified at 42 U.S.C. § 2000e–3(a), provides as follows:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

In dismissing Nicolaou's claim under Section 510 of ERISA, the district court relied on our decision in *Lambert v. Genesee Hospital*, 10 F.3d 46 (2d Cir.1993). In that case, this Court held that Section 15(a)(3) of FLSA does not apply to retaliation taken in response to internal complaints, as opposed to retaliation occurring after an employee has cooperated with an investigation brought by a regulatory agency. In doing so, the Court relied upon a comparison of FLSA Section 15(a)(3) with the whistleblower provision contained in Title VII:

> The phrase "opposed any practice" [in Section 704(a) of Title VII] encompasses an individual's complaints to supervisors regardless of whether she also files an EEOC charge. *Kotcher v. Rosa & Sul-*

*livan Appliance Ctr., Inc.*, 957 F.2d 59, 65 (2d Cir.1992).

> In contrast, ... [t]he plain language of [FLSA Section 15(a)(3) ] limits the cause of action to retaliation for filing formal complaints, instituting a proceeding, or testifying, but does not encompass complaints made to a supervisor.

*Id.* at 55.

The district court here declared that it could "find no distinction" between FLSA's whistleblower provision and Section 510 of ERISA. *Nicolaou*, 2003 WL 22852680, at \*2, 2003 U.S. Dist. LEXIS 18341, at \*7. Following *Lambert*, it therefore concluded that "the inquiry contemplated by § 510 can only be a formal, external inquiry. Participation in an internal inquiry is not a protected activity under § 510." *Id.*[2] We do not agree, however, with the district court that *Lambert* is decisive here. Our conclusion is based upon the plain language of ERISA Section 510, which is unambiguously broader in scope than Section 15(a)(3) of FLSA.

■ First, the whistleblower provision of FLSA extends protection against retaliation to any person who "has filed any complaint or instituted or caused to be instituted any proceeding under or related to" FLSA. 29 U.S.C. § 215(a)(3). By contrast, Section 510 of ERISA applies to "any *inquiry* or proceeding relating to" ERISA. 29 U.S.C. § 1140 (emphasis added). We agree with the Secretary of Labor's assertion here that "[w]hatever level of formality is implied by the term 'proceeding' " in FLSA, the use of the somewhat less formal term "inquiry" in ERISA is indicative of an intent "to ensure protection for those involved in the informal

---

2. We note that, based largely upon the reasoning of the district court in this case, another court in the Southern District of New York has also held that a "protected activity" for the purposes of Section 510 does not encompass complaints made to supervisors regarding possible ERISA violations. *See Monaco v. Smith*, No. 00 Civ. 5845, 2004 WL 203009, at \*12–\*13, 2004 U.S. Dist. LEXIS 1334, at \*42–\*46 (S.D.N.Y. Feb.2, 2004).

gathering of information." Congress manifested such an intent when it chose, in drafting Section 510, to conjoin to the term "proceeding," found in FLSA Section 15(a)(3), the additional term "inquiry," which is not contained in Section 15(a)(3) and which has a distinct definition. While "proceeding" refers to the progression of a lawsuit or other business before a court, agency, or other official body, "inquiry" refers broadly to any request for information. *Compare, e.g., Black's Law Dictionary* 1241 (8th ed.2004) (defining "proceeding" as "[t]he regular and orderly progression of a lawsuit," "[a]ny procedural means for seeking redress from a tribunal or agency," or "[t]he business conducted by a court or other official body") *and Webster's Third New International Dictionary* 1807 (1993) (defining "proceedings" as "the course of procedure in a judicial action or in a suit in litigation") *with Black's Law Dictionary* 808 (8th ed.2004) (defining "inquiry" as "[a] request for information") *and Webster's Third New International Dictionary* 1167 (1993) (defining "inquiry" as "the act or an instance of seeking truth, information, or knowledge about something" or "a request for information"). The "informal gathering of information" thus falls within the plain meaning of "inquiry," and we need go no further to conclude that it is protected by Section 510. We presume that Congress intends that its statutory text be read in accordance with its plain meaning, *see BedRoc Ltd. v. United States,* 541 U.S. 176, 124 S.Ct. 1587, 1593, 158 L.Ed.2d 338 (2004), and we presume that none of the language enacted by Congress is superfluous, *see TRW Inc. v. Andrews,* 534 U.S. 19, 31, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001). Congress's decision to include both terms, rather than merely the single term "proceeding" that it included in FLSA Section 15(a)(3), strongly indicates an intention "to give the nouns their separate, normal meanings," *Garcia v. United States,* 469 U.S. 70, 73, 105 S.Ct. 479, 83 L.Ed.2d 472 (1984) (citing *FCC v. Pacifica Found.,* 438 U.S. 726, 739–40, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978)), and thus to go beyond the protections afforded by FLSA. Our conclusion is further buttressed by the fact that Section 510 covers not only the act of testifying in a formal proceeding, as does FLSA Section 15(a)(3). Rather, its protections are extended to "any person [who has] *given information* or has testified or is about to testify *in any inquiry* or proceeding relating to" possible violations of ERISA. 29 U.S.C. § 1140 (emphasis added).

■ With this statutory language in mind, we return to the facts of this case. The alleged event that appears to have triggered Nicolaou's termination was the November 1999 meeting at which Nicolaou and Silverman informed Horizon's President, Koenigsberg, of their belief that the company's 401(k) plan had for years been underfunded. The amended complaint alleges that "[w]ithin days" of this meeting, a campaign of retaliation was directed at Nicolaou which culminated in her termination. ¶ 32.

The meeting with Koenigsberg had its genesis in Nicolaou's prior meeting with Silverman, at which she expressed her belief that the Plan was being underfunded. The amended complaint alleges that after this first meeting, Silverman conducted his own investigation of the Plan and reached the same conclusion as had Nicolaou. Although the amended complaint is unclear on the matter, Nicolaou's counsel asserted at oral argument that it was Silverman's suggestion that they meet with Koenigsberg. Silverman's precise status is also unclear in the amended complaint, but we were informed at oral argument that he served as outside counsel to Horizon.

Certainly, if Nicolaou can demonstrate that she was contacted to meet with Koenigsberg in order to give information about the alleged underfunding of the Plan, her actions would fall within the protection of Section 510. Thus, the district court erred in concluding that, as a matter of law, Nicolaou's allegations could not survive a motion to dismiss because they do not establish the existence of "a formal, external inquiry." 2003 WL 22852680, at *2, 2003 U.S. Dist. LEXIS 18341, at *7. The meeting with Koenigsberg was something less than a formal proceeding, but we believe it was sufficient to constitute an "inquiry" within the meaning of Section 510.

■ Finally, contrary to Horizon's reading of the case, we do not believe that our holding is in conflict with the Fourth Circuit's recent decision in *King v. Marriott Int'l, Inc.*, 337 F.3d 421, 427 (4th Cir.2003), which read Section 510's use of the phrase "inquiry or proceeding" as reaching only "the legal or administrative, or at least . . . something more formal than written or oral complaints made to a supervisor." *Id.* at 427.[3] In any event, as we have explained, the proper focus is not on the formality or informality of the circumstances under which an individual gives information, but rather on whether the circumstances can fairly be deemed to constitute an "inquiry." Nicolaou's meeting with Koenigsberg regarding possible violations of ERISA—a meeting that was initiated at Silverman's behest—falls within the definition of an "inquiry" and, therefore, the protection of Section 510.

**3.** Although we agree with the Fourth Circuit that Section 510 protects those who engaged in "something more formal than written or oral complaints made to a supervisor," we disagree that Congress's use of the phrase "testify or about to testify" dictates that result. As we read the statutory text, the reference to testimony is wholly irrelevant to our understanding of the language "given information . . . in any inquiry or proceeding," which is at issue in this case. Our interpretation of Section 510 is based on the respective meanings of the terms "inquiry" and "proceeding," not the juxtaposition of those terms with any reference to testimony.

## CONCLUSION

The district court's dismissal of the amended complaint pursuant to Rule 12(b)(6) is reversed. As indicated above, we believe that certain allegations made in the amended complaint are ambiguous, and only became less so when supplemented by assertions made by Nicolaou's counsel during oral argument on this appeal. Thus, upon remand, we direct the district court to afford Nicolaou the opportunity to file a revised amended complaint which will serve to eliminate these ambiguities.

POOLER, Circuit Judge, concurring.

I agree with the result reached by the majority, but I am concerned that we have not afforded Nicolaou with the full scope of ERISA Section 510's protections. I would focus on Nicolaou's alleged status as a fiduciary of the Plan, a status which would have placed upon her no small burden to ensure that the Fund was being properly operated. A fiduciary of an employee benefits plan regulated by ERISA is required to discharge her "duties with respect to [the] plan solely in the interest of the participants and beneficiaries . . . ." 29 U.S.C. § 1104(a)(1). The statute penalizes fiduciaries who commit breaches of their duties by making them "personally liable to make good . . . any losses to the plan resulting from each such breach . . . ." 29 U.S.C. § 1109(a). Some time ago, we characterized the duties of a fiduciary under ERISA "to the participants and beneficiaries of the plan [as] . . . those of an

express trust—the highest known to the law." *Donovan v. Bierwirth,* 680 F.2d 263, 272, n. 8 (2d Cir.1982).

What is more, a fiduciary under ERISA turns a blind eye to improprieties at her great peril. ERISA explicitly provides in the following terms that a fiduciary's liability may rest upon more than her own wrongful acts:

> In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> \* \* \* \* \* \*
>
> (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

29 U.S.C. § 1105(a)(3).

Thus, a fiduciary under ERISA is strongly encouraged, as a means of avoiding personal liability, to take steps to remedy perceived improprieties in plan operations. That is, an ERISA fiduciary "may not avoid liability for mismanagement by simply doing nothing." 1 Ronald J. Cooke, *ERISA Practice and Procedure,* § 6:11, at 6–126 (2d ed.2004) (citing *Free v. Briody,* 732 F.2d 1331, 1336 (7th Cir.1984)). Numerous recent cases illustrate the point. *See, e.g., In re CMS Energy ERISA Litig.,* 312 F.Supp.2d 898, 909–10 (E.D.Mich.2004) (ERISA fiduciaries who are not alleged to have participated in co-fiduciaries' breaches may still be liable if they had knowledge of, but took no action to prevent, co-fiduciaries' acts); *In re Dynegy, Inc. ERISA Litig.,* 309 F.Supp.2d 861, 905–06 (S.D.Tex. 2004) (same); *In re Enron Corp. Sec., Derivative & ERISA Litig.,* 284 F.Supp.2d 511, 661–62 (S.D.Tex.2003) (ERISA fiduciaries may be liable for failing to investi-

gate the propriety of investments of plan funds made by co-fiduciaries).

In light of ERISA's imposition of liability upon fiduciaries who fail to take reasonable steps to prevent the breaches of her co-fiduciaries, I am troubled by the district court's conclusion that Section 510's protections against retaliation do not become effective until "a formal, external inquiry" into possible violations of ERISA is launched. *Nicolaou v. Horizon Media,* 2003 WL 22852680, at \*2 (S.D.N.Y. Oct.15, 2003). Looking at Section 510 alone, the district court correctly stated that its language does not "make any exception for fiduciaries" such that they are afforded greater protection from retaliation than anyone else who has participated in an investigation of possible violations of ERISA. *Id.* at \*3.

But considering Section 510 in conjunction with the provisions of ERISA just discussed, the district court's reading does not give a fiduciary such as Nicolaou sufficient protection from retaliation after she has taken appropriate steps to investigate possible breaches of duty by other fiduciaries. In fact, the district court's limitation of Section 510 to the context of "a formal, external inquiry" would seem to leave a prudent fiduciary with nothing but unattractive options when she discovers possible breaches of duty: (1) do nothing and face possible co-fiduciary liability under ERISA Section 405; (2) make her own inquiries among her superiors and face a retaliatory response; (3) bring the matter to the attention of a regulatory agency and hope that doing so is not discovered by her superiors, at least until the agency begins its own inquiry; or (4) take upon herself the burden, and the uncertain prospects, of filing a suit under the provision of ERISA which allows fiduciaries to seek "to enjoin any act or practice which violates" the statute. 29 U.S.C. § 1132(a)(3).

I do not believe that ERISA's framers intended to place fiduciaries in such an unenviable position. Instead, I agree with the reasoning of a Minnesota district court to the effect that it is best to avoid the anomalous result discussed in the following passage:

> ERISA affords plaintiff the right to sue to enjoin any act or practice which violates ERISA. 29 U.S.C. § 1132(a)(3). Plaintiff clearly would have recourse under § 510 had she been discharged in retaliation for commencing a legal action against defendant to correct what she perceived to be violations of ERISA. In view of the express authorization which plaintiff possesses under ERISA to *sue* to remedy violations of ERISA, the court finds it logical to infer that plaintiff also possesses the right to inform plan administrators of suspected violations of ERISA. The opposite conclusion would provide a strong incentive to plan participants to institute litigation without first attempting to resolve the issue informally.

*McLean v. Carlson Cos., Inc.*, 777 F.Supp. 1480, 1484 (D.Minn.1991).

In light of Nicolaou's status as an ERISA fiduciary, I believe that the allegations of the amended complaint set forth "reasonable efforts" on her part, within the meaning of 29 U.S.C. § 1105(a)(3), to see that Horizon's 401(k) plan was operated in accordance with the regulatory program set forth in ERISA. I also believe that it is reasonable to conclude that such efforts fall within the protection of Section 510 from the point at which Nicolaou began to conduct her own inquiry into the alleged underfunding of the Plan, and not merely from the point at which Nicolaou and Silverman met with Koenigsberg. As stated by the Secretary of Labor, appearing here as amicus curiae:

> If fiduciaries do not receive [S]ection 510's protection during the *initial stages* of an internal investigation, and have reason to fear that they may lose their jobs if they raise or attempt to address concerns about the plan [they administer], they may be hesitant to vigorously carry out [their] essential and mandated fiduciary functions.

This is surely a result to be avoided.